## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TOMMY STELLY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-2498** |
| **ABDON CALLAIS OFFSHORE, L.L.C.** | **SECTION: "G"(1)** |

## ORDER AND REASONS

Before the Court is Defendant Abdon Callais Offshore, LLC's ("Defendant") Motion for Partial Summary Judgment,[1] wherein it seeks the dismissal of Plaintiff Tommy Stelly's ("Plaintiff") claims arising from an alleged incident on February 2, 2012, arguing that he did not qualify as a Jones Act seaman at that time. After considering the complaint, the pending motion, the memorandum in support, the opposition, the reply, the record, and the applicable law, the Court will deny the pending motion.

## I. Background

### A. Factual Background

Plaintiff alleges that on or about May 3, 2009, he was employed by Defendant as a Jones Act Seaman aboard the M/V O.P. CALLAIS, which Defendant owned and operated at all pertinent times.[2] On that date, Plaintiff alleges he "experienced an accident which resulted in serious painful injuries to his left arm."[3] Plaintiff contends that the incident was caused by the negligence of Defendant and the unseaworthiness of the vessel, and as a result he "was rendered unfit for duty and

---

[1] Rec. Doc. 22.

[2] Rec. Doc. 1 at ¶¶ 3-4.

[3] *Id.* at ¶ 5.

presently remains unfit and incapable of returning to duty as a seaman."[4] Plaintiff also alleges a second accident that occurred on February 2, 2012. Plaintiff claims that he "sustained an injury to his neck and back, and aggravation of his arm injury," while "working as a Jones Act seaman assigned to the M/V HAROLD J. CALLAIS."[5] Plaintiff claims negligence and unseaworthiness was the proximate cause of this incident as well.[6]

### B. Procedural Background

Plaintiff filed suit in this matter on October 12, 2012, invoking this Court's jurisdiction under the Jones Act, General Maritime Law, and diversity.[7] Defendant filed the pending motion for summary judgment on April 29, 2013.[8] On May 14, 2013, Plaintiff filed an opposition.[9] On May 16, 2013, with leave of court, Defendant filed a reply.[10]

## II. Parties' Arguments

### A. Defendant's Memorandum in Support

In support of the pending motion, Defendant contends that after the May 3, 2009 incident, Plaintiff received cure from Defendant, and began to work in its land-based warehouse until he received surgery necessitated by the alleged accident.[11] After the surgery, Plaintiff continued to work

---

[4] *Id.* at ¶¶ 6-9.

[5] *Id.* at ¶ 12.

[6] *Id.* at ¶¶ 13-14.

[7] *Id.* at ¶ 2.

[8] Rec. Doc. 22.

[9] Rec. Doc. 24.

[10] Rec. Doc. 27.

[11] Rec. Doc. 22-1 at p. 2 (citing Deposition of Plaintiff, Rec. Doc. 22-3 at pp. 47-48).

at the warehouse for three to six months.[12] Subsequently, Plaintiff was asked by Defendant to "go to [Defendant's shipyard] in Leeville where he would work supervising crews on vessels getting ready for inspections."[13] After working at the Leeville facility for about a year, Plaintiff was sent to a newly acquired facility of Defendant, which Plaintiff calls "Durlage," but is also called "Safe Harbor."[14] Defendant contends that this was a facility where Defendant "could keep its vessels which had been 'cold stacked' or removed from active service."[15]

While at "Durlage," Plaintiff's duties "were to keep the boats running and keep them clean and make sure that the boats stayed tied up and weren't taking on water."[16] Plaintiff worked this job for about a year before the alleged February 2, 2012 incident. Defendant also notes that after Plaintiff returned to work following his surgery, and before he began working at Leeville or "Durlage," Plaintiff applied for, but could not obtain, a Transportation Worker Identification Card (TWIC) and  a TWIC was necessary to sail as a seaman on Defendant's vessels.[17]

Defendant argues that "Durlage" was acquired by Defendant for its vessels that were not actively being chartered.[18] Defendant contends that Plaintiff's duties at "Durlage" or "Safe Harbor" were "to manage 'Safe Harbor', see that no outside visitors entered the yard without permission, and oversee the cold stacked vessels making sure they stayed moored safely, were kept clean and that

---

[12] *Id.* (citing Rec. Doc. 22-3 at pp. 47-78).

[13] *Id.* (citing Rec. Doc. 22-3 at pp. 50-51).

[14] *Id.*

[15] *Id.* (citing Rec. Doc. 22-3 at pp. 52-54).

[16] *Id.* (citing Rec. Doc. 22-3 at pp. 56-57).

[17] *Id.* at pp. 2-3 (citing Rec. Doc. 22-3 at pp. 88-91).

[18] *Id.* at p. 3 (citing Deposition of Roger D. Arceneaux, Rec. Doc. 22-4 at p.6) Arceneaux is a "DP 2 supervisor" for Defendant. *See* Rec. Doc. 22-4 at p. 6:19-20.

their generators were run one day per week."[19] Defendant notes that while Plaintiff stayed on the M/V HAROLD J CALLAIS, the vessel was hooked up to shore power and the certificates of inspection from the United States Coast Guard from that vessel and the EARLY BIRD were not active has had been turned into the Coast Guard.[20]

Defendant alleges that on February 2, 2012, Roger Arceneaux, a supervisor for Defendant, instructed Plaintiff to take some pictures of the M/V EARLY BIRD. Later that day, an employee of Defendant, Daniel Lorraine, encountered Plaintiff, who said he fell down the starboard stairway of the EARLY BIRD, and Lorraine arranged for Plaintiff to receive medical treatment.[21] Thereafter, Plaintiff never returned to work.[22]

With regard to the February 2, 2012 incident, Defendant contends that Defendant was not a seaman as defined by the United States Supreme Court in *Chandris v. Latsis*.[23] Defendant argues that Plaintiff does not meet the first requirement set out in *Chandris*, because he was not working at sea.[24] Despite sleeping on a vessel, Defendant avers that Plaintiff was not exposed to the "perils of the sea," but was merely "watching over a group of 'cold stacked' vessels that were not working."[25]

---

[19] Rec. Doc. 22-1 at p. 3 (citing Rec. Doc. 22-4 at p. 12).

[20] *Id.* (citing Rec. Doc. 22-4 at p. 17).

[21] *Id.*

[22] *Id.* at p. 4.

[23] 515 U.S. 347 (1995).

[24] Rec. Doc. 22-1 at p. 4.

[25] *Id.*

4

Defendant does not dispute that at the time of the alleged May 3, 2009 incident, Plaintiff was a seaman, but avers that after that incident Plaintiff:

> never worked as a member of the crew of [Defendant's] vessel[s] again. Rather, he worked in the warehouse on land, in the Leeville shipyard, and "Safe Harbor" and, as such, was not subjected to the perils of the sea. Indeed, [Plaintiff] was, on February 2, 2012, a "harbor worker" which makes him a covered worker under the Longshore and Harbor Worker Compensation Act ("LHWCA"). A covered worker under the LHWCA is, by definition not a seaman and a seaman, by definition, not a covered worker under the LHWCA.[26]

Defendant also argues that Plaintiff fails to satisfy the second requirement for seaman status set forth in *Chandris*, that a seaman must have an employment related connection to a vessel in navigation that is substantial in terms of both its duration and its nature.[27] Defendant contends that not only does Plaintiff fail this prong because his work at "Safe Harbor" did not regularly expose him to the perils of the sea, but also because the cold stacked vessels at "Safe Harbor" were not vessels in navigation.[28] Defendant cites the affidavit of William J. Foret, Chief Executive Officer of Defendant, who states that the EARLY BIRD had been out of service since September 24, 2009 when its certificate of inspection was surrendered to the United States Coast Guard, without which it "could not work."[29] Further, Defendant states that:

> The Early Bird was not in a situation where she was simply at a dock having returned from a voyage or simply under going minor repairs. She has been totally removed from navigating the Gulf of Mexico since September 24, 2009. As pointed out on page 374 of Chandris, a vessel may be out of navigation when it is removed from service for a lengthy period of time.[30]

---

[26] *Id.* at p. 5.

[27] *Id.*

[28] *Id.*

[29] *Id.* at pp. 5-6 (citing Affidavit of William Foret, Rec. Doc. 22-6).

[30] *Id.*

Finally, Defendant argues that reference to the incident reports are "educational" on Plaintiff's status. The incident report from the May 3, 2009 incident lists the crew and Plaintiff as one of the crew members. In contrast, the incident report for the February 2, 2012 incident shows "no crew and no crew member job for [Plaintiff]."[31]

### B. Plaintiff's Opposition

In opposition to the pending motion, Plaintiff claims that he was initially hired by Defendant as a deckhand, and then promoted to engineer.[32] Plaintiff argues that throughout all of his job assignments, he has received engineer's pay and that his duties have remained the same – those of an engineer.[33] Plaintiff notes that the determination of seaman status under the Jones Act is a mixed question of fact and law, which should usually be resolved by the jury.[34]

With regard to the first prong, Plaintiff claims that this is a low hurdle, and a plaintiff need only show that "he does ship's work."[35] Regarding the "perils of the sea," Plaintiff argues that the courts have not expressly defined this term, but that even vessels that are temporarily moored will not defeat seaman status.[36] Plaintiff claims that "perils of the sea" is a "'term of art that embraces ... vessel-movement dangers.'"[37] Plaintiff argues that when his entire working history is considered,

---

[31] *Id.* at p. 6 (citing Rec. Doc. 22-3 at pp. 109-13).

[32] Rec. Doc. 24 at pp. 1-2.

[33] *Id.* at p. 2.

[34] *Id.* at p. 3 (citing *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548 (1997); *Becker v. Tidewater, Inc.*, 335 F.3d 375 (5th Cir. 2003)).

[35] *Id.* at p. 5 (citing *Chandris*, 515 U.S. at 347).

[36] *Id.* (citing *In re Endeavor Marine*, 234 F.3d 287 (5th Cir. 2000)).

[37] *Id.* at p. 6 (quoting *Navarre v. Kostmayer Constr. Co.*, 2010-0490 (La. App. 4 Cir. 11/24/10); 52 So. 3d 921, 929 n. 17) (alterations in Plaintiff's memorandum).

including his years as a deckhand and then engineer up to 2009, he satisfies this requirement.[38] He

also claims that he was only "temporarily" at "Safe Harbor" while he recovered his the 2009 injury.[39]

However, Plaintiff avers that "even if limited to the temporary Bayou Durlage assignment,

plaintiff still qualifies as a seaman."[40] Specifically, Plaintiff states:

> Plaintiff"s job title was always engineer. The duties he performed were those of an
> engineer with the possible exception of the few months he worked at the dry dock
> in the Leesville [sic] Yard and the time that he initially worked as a deckhand. It is
> undisputed that plaintiff was a seaman up until his first accident in May 2009.
> However, the facts at the very least establish that reasonable minds could differ as
> to whether he maintained his seaman status through his February 2012 accident.[41]

Plaintiff proposes that he can be considered a seaman under two different calculations:

> First, plaintiff can be considered a seaman due to the nature of his work between
> May 2009 and February 2012. He was assigned to the M/V HAROLD CALLAIS –
> a vessel in navigation as discussed below – and his equipment was housed on this
> vessel.42 His work contributed to the function of an entire fleet of ACO vessels as
> well as to the accomplishment of their mission.

> Second, plaintiff can be considered a seaman under the totality of circumstance
> surrounding his 7 years of employment with ACO. He did not lose his seaman status
> by virtue that he was temporarily assigned other jobs while he was healing from his
> first injury (or for that matter, even if he was waiting on approval for his TWIC
> card). At all times during his 7 year career with ACO, he performed duties typical
> of a seaman (except possibly the time in the warehouse and dry dock, again a small
> period of a few months out of 7 years). His duties at Bayou Dularge/Safe Harbor
> clearly contributed to the function of the vessels and the accomplishment of their
> missions. He prepared them for charter. This maintenance work alone contributes to
> the function and mission of the vessels.[42]

---

[38] *Id.*

[39] *Id.* at p. 7.

[40] *Id.*

[41] *Id.*

[42] *Id.* at pp. 7-8.

Plaintiff also alleges that he satisfies the second prong, that the employee has a substantial connection to a vessel in navigation (or fleet of vessels).[43] Plaintiff notes that the Supreme Court and Fifth Circuit have imposed a 30% rule, where an employee's working time is substantial if more than 30% of his hours are in connection to a vessel in navigation. Plaintiff argues that even if the "Safe Harbor" time is not considered as time in the service of vessels, Plaintiff still meets the 30% threshold because it is undisputed that he was a seaman for at least 4 of the 7 years he worked for Defendant.[44]

Plaintiff refutes Defendant's argument that he does not meet this prong because he did not have employment with a "vessel in navigation." However, Plaintiff contends that this requirement does not require that a "vessel actually be under way."[45] Plaintiff argues that the vessels at "Safe Harbor" constitute vessels in navigation. "To suggest otherwise would be to remove any moored vessel from vessel status while it sat dockside."[46] Moreover, Plaintiff proposes that:

> these vessels, including the HAROLD J> [sic] CALAIS [sic] all still maintained their Certificates of Inspection on the day of the accident (and before and after such) as evidenced by the fleet log for Bayou Dularge on the date of the accident. This fleet log states that the 'COI' (certificate of inspection) was on file in Houma for the vessel to which Stelly was assigned on the date of his accident (or the fleet of vessels). The question is ultimately whether the watercraft's use as a means of transportation is a practical possibility or merely a theoretical one. A vessel is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment.[47]

---

[43] *Id.* at p. 8.

[44] *Id.* at p. 9.

[45] *Id.* (citing *Stewart v. Dutra Const. Co.*, 543 U.S. 481 (2005)).

[46] *Id.* at p. 10.

[47] *Id.* (internal quotation marks and citations omitted).

Plaintiff argues that the "Safe Harbor" vessels were "simply not under contract as opposed to out of service."[48] Plaintiff also points to the deposition of Roger Arceneaux, the DP2 Supervisor, who states that the "Safe Harbor" vessels were not actively being chartered.[49] Through citation to the depositions of Plaintiff and Arceneaux, Plaintiff argues that these vessels would not permanently stay at "Safe Harbor" for an extended period of time, and that "Safe Harbor" was not a dry dock where vessels were totally taken out of service; in fact, it was Plaintiff's job to get the vessels ready for when they came under contract; moreover, these vessels were not always at "Safe Harbor," and would move in and out. When this happened, Plaintiff would "ride on the boats."[50] Plaintiff also cites the deposition of Arceneaux to support his contention that the vessels at "Safe Harbor" were only placed there because they were not under contract, but they were all fully functional, and none of the vessels had lost their ability to navigate.[51]

Finally, Plaintiff refutes some of the assertions made in Foret's affidavit, which Defendant referenced in the memorandum in support. Plaintiff argues that Paragraph 8 of the affidavit "implies that the vessels kept at Durlage/Safe Harbor were not working. However, this is in direct conflict with both plaintiff and Roger Arceneaux's testimony that all of the vessels kept there were fully functioning and were merely there while not under contract."[52]

---

[48] *Id.* (citing Rec. Doc. 22-3 at pp. 102-05).

[49] *Id.* at pp. 10-11 (citing Rec. Doc. 22-4 at p. 6).

[50] *Id.* at p. 11 & nn. 56-61.

[51] *Id.* & nn.64-66.

[52] *Id.* at p. 12.

*C. Defendant's Reply*

In reply, Defendant reiterates that Plaintiff has received compensation benefits in compliance with the LHWCA, and that a covered worker under the LHWCA is not a seaman by definition.[53] Defendant also argues that Plaintiff "misses the prongs of *Chandris* because his work does not contribute to the function of the vessel which is to sail in the Gulf of Mexico delivering men and equipment to the offshore oil industry."[54] Finally, Defendant argues that the EARLY BIRD could not be a vessel in navigation because it turned in its COI in 2009 to the Coast Guard.[55]

### III. Standard on a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[56] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence but refrains from making credibility determinations or weighing the evidence."[57] All reasonable inferences are drawn in favor of the nonmoving party, but "'conclusory allegations supported by a conclusory affidavit will not suffice to require a trial.' This is true even if the movant cannot demonstrate contrary facts by specific affidavit recitation to rebut the conclusory affidavit."[58] If the record, as a whole, could not lead a

---

[53] Rec. Doc. 27 at p. 2.

[54] *Id.*

[55] *Id.*

[56] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[57] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[58] *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993) (quoting *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986)).

rational trier of fact to find for the nonmoving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[59]

Because factual disputes may not be resolved on summary judgment, a plaintiff need not offer all of its evidence, but rather only enough so that a jury *might* return a verdict in its favor.[60] If the nonmovant would bear the burden of proof at trial on a claim, the movant may simply point to the absence of evidence, which then returns the burden on the motion for summary judgment to the nonmovant.[61] Then, the nonmovant must point to competent evidence that there is an issue of material fact so as to warrant trial.[62] To defeat summary judgment, the nonmovant must direct the court's attention to specific evidence in the record to establish an issue of material fact as to each claim upon which it will bear the burden of proof at trial.[63] "The opponent must meet the movant's affidavits with opposing affidavits that set out specific facts showing an issue for trial."[64]

## IV. Law and Analysis

### A. Seaman Status under the Jones Act- Generally

As both parties have recognized, the Supreme Court has developed a two-prong test to determine seaman status. First, a plaintiff must show that his duties "contribut[e] to the function of the vessel or to the accomplishment of its mission."[65] Second, "a seaman must have a connection to

---

[59] *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147-48 (5th Cir. 1992).

[60] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991).

[61] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (per curiam).

[62] *Id.*

[63] *Rizzo v. Children's World Learning Ctrs.*, 84 F.3d 758, 762 (5th Cir. 1996).

[64] *Travelers,* 7 F.3d at 1206-07.

[65] *Chandris*, 515 U.S. at 368.

a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."[66] "Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."[67]

"The seaman inquiry is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury."[68] The Fifth Circuit has instructed "'that the question of seaman status should only be removed from the trier of fact (by summary judgment or directed verdict) in rare circumstances and that even marginal Jones Act claims should be submitted to the jury.'"[69] However, "judgment as a matter of law is mandated where the facts and the law will reasonably support only one conclusion."[70]

## B. Analysis

### 1. First Prong of *Chandris*

The Fifth Circuit has acknowledged that satisfaction of this prong is "relatively easy," as a plaintiff need only show that he does ship's work.[71] "This threshold requirement is 'very broad,' encompassing 'all who work at sea in the service of a ship.'"[72] Defendant has argued that Plaintiff fails to satisfy this "relatively easy" threshold requirement, because Plaintiff did not work at sea and

---

[66] *Id.*

[67] *Id.* at 371.

[68] *Harbor Tug*, 520 U.S. at 554.

[69] *Sharp v. Johnson Bros. Corp.*, 917 F.2d 885, 888 (5th Cir. 1990) (quoting *Bernard v. Binnings Constr. Co.*, 741 F.2d 824, 827 (5th Cir. 1984)).

[70] *Becker*, 335 F.3d at 386.

[71] *Id.*

[72] *Id.* (quoting *Chandris*, 515 U.S. at 368).

therefore was not exposed to its perils.[73] However, this is not the focal point of the first prong, and a showing that the employee contributes to the function of the vessel or the accomplishment of its mission is all that is required.[74]

In opposition, Plaintiff has directed the Court to his deposition where he states that his duties included preparing the vessels so they would be ready for when they came under contract.[75] Therefore, Plaintiff has submitted evidence that he contributed to the function of a vessel and the accomplishment of its mission.[76] This evidence suffices to satisfy Plaintiff's burden to defeat summary judgment on this issue, especially when the Court keeps in mind that even marginal Jones Act claims should be submitted to the jury.[77] Therefore, unless Plaintiff fails to satisfy his burden to defeat summary judgment as to the second prong, the jury must resolve this issue.

### 2. Second Prong of *Chandris*

The second prong requires a plaintiff to have a substantial connection to a vessel in navigation (or of an identifiable group of such vessels) that is substantial in terms of both duration and nature:

> The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation,

---

[73] *See* Rec. Doc. 22-1 at p. 4.

[74] *Chandris*, 545 U.S. at 368.

[75] Rec. Doc. 24 at p. 11 & nn.56-61 (citations to Plaintiff's deposition).

[76] *See Chandris*, 515 U.S. at 368.

[77] *Sharp*, 917 F.2d at 888.

13

and therefore whose employment does not regularly expose them to the perils of the sea.[78]

Defendant contends that Plaintiff does not satisfy the second prong because his work at "Safe Harbor" did not regularly expose him to the perils of the sea, and because the vessels at "Safe Harbor" were not in navigation.[79] To the first issue, Plaintiff has cited to his own deposition where he explains how part of his job duties at "Safe Harbor" involved moving vessels in and out of the facility; when these vessels would be moved, he would be on board while a captain navigated the vessel, and on at least one occasion Plaintiff moved the vessel himself.[80] Moreover, the Fifth Circuit has noted that it is the "employee's connection to a vessel," not the particular job, that is the crux of this factor.[81] In fact, the Fifth Circuit has expressly stated that "even a ship repairman (which is traditional longshoreman work and is one of the enumerated occupations under the LHWCA) may qualify for seaman status if he has the requisite employment-related connection to the vessel."[82] Plaintiff has brought forward some evidence that his work did expose him to the perils of the sea and that he had a substantial connection to the vessels at "Safe Harbor."

As noted above, Defendant also claims that the vessels at "Safe Harbor" were not "in navigation." The Supreme Court has noted that "a watercraft is not 'capable of being used' for

---

[78] *Chandris*, 515 U.S. at 368.

[79] Rec. Doc. 22-1 at p. 5.

[80] Rec. Doc. 22-3 at pp. 97-99.

[81] *In re Endeavor Marine Inc.*, 234 F.3d at 291 (citing *Chandris*, 515 U.S. at 364).

[82] *Id.*

14

maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement."[83] However:

> A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again.[84]

In support of his claim that the vessels at "Safe Harbor" qualify for Jones Act coverage, Plaintiff has cited to the deposition of himself and Roger Arceneaux. These accounts provide at the very least some evidence that the vessels were simply not under contract instead of out of service, were maintained at "Safe Harbor" for when they did come under contract, and were fully functional and had not lost their ability to navigate. In contrast, Defendant has submitted the affidavit of William Foret, where he states that the EARLY BIRD had been out of service since September 2009 and "could not work." Accordingly, a dispute as to a material fact exists on this issue, which precludes summary judgment.

### 3. Plaintiff's Receipt of LHWCA Payments

While not directly addressed, throughout its briefing on this motion, Defendant notes several times that Plaintiff is receiving benefits under the LHWCA.[85] The Court recognizes that under binding precedent, a plaintiff's receipt of LHWCA compensation does not affect the analysis of the

---

[83] *Stewart*, 543 U.S. at 494.

[84] *Id.*

[85] *See* Rec. Doc. 22-1 at p. 5; *see also* Rec. Doc. 27 at pp. 2, 3.

issues addressed above in any way. In *Southwest Marine, Inc. v. Gizoni*,[86] the Supreme Court

addressed this issue and stated:

> Finally, Southwest Marine suggests that an employee's receipt of benefits under the
> LHWCA should preclude subsequent litigation under the Jones Act. ***To the contrary,***
> ***however, we have ruled that where the evidence is sufficient to send the threshold***
> ***question of seaman status to the jury, it is reversible error to permit an employer***
> ***to prove that the worker accepted LHWCA benefits while awaiting trial***. It is by
> now "universally accepted" that an employee who receives voluntary payments
> under the LHWCA without a formal award is not barred from subsequently seeking
> relief under the Jones Act. This is so, quite obviously, because the question of
> coverage has never actually been litigated. Moreover, the LHWCA clearly does not
> comprehend such a preclusive effect, as it specifically provides that any amounts
> paid to an employee for the same injury, disability, or death pursuant to the Jones Act
> shall be credited against any liability imposed by the LHWCA.5 33 U.S.C. §
> 903(e).[87]

Considering the controlling authority on this issue, Plaintiff has provided sufficient evidence to

establish that there is a material fact in dispute regarding his seaman status, and the Court will not

allow the Defendant to use the fact that Plaintiff received LHWCA benefits while awaiting trial as

evidence to defeat Plaintiff's status; further, the Court draws no inference from Plaintiff's alleged

receipt of LHWCA payments.

---

[86]  502 U.S. 81 (1991).

[87]  *Id.* at 91 (internal citations omitted).

16

### V. Conclusion

Plaintiff has come forward with sufficient evidence to demonstrate disputed issues of fact regarding his status as a seaman, and therefore has carried his burden to defeat summary judgment. Therefore, the issue of Plaintiff's seaman status on February 2, 2012 must be decided by the jury. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment[88] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this  21st  day of June, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[88] Rec. Doc. 22.

17